UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARLENE CORREIA-PIRES          )
                              )
     Plaintiff,               )
                              )
v.                            )     CIVIL ACTION NO.
                              )     10-10724-DPW
MICHAEL J. ASTRUE             )
COMMISSIONER                  )
SOCIAL SECURITY ADMINISTRATION)
                              )
     Defendant.               )

MEMORANDUM AND ORDER
July 29, 2011

     Plaintiff Arlene Correia-Pires filed this appeal to
challenge of the final decision of the Commissioner of Social
Security (the "Commissioner") denying her application for Social
Security Disability Insurance ("SSDI") and Supplemental Security
Income ("SSI") benefits.  Finding that the record provides
substantial evidence for the denial, I will affirm the decision
of the Commissioner.

## I.  BACKGROUND

### A.  *Plaintiff's Medical History*

#### 1.  Physical Impairments

     Mrs. Correia-Pires suffers from a series of physical
impairments.  In July 2004, she was diagnosed with asthma,
migraines, and obesity by her primary care physician, Lucia Dias-
Hoff, M.D.  (Adm. Rec. 246.)  She continued treatment for these
conditions throughout May 2009.  (*Id*. at 250-82, 286-303, 423-52,

1

505-06.)  In December 2006, Mrs. Correia-Pires sustained a work-related injury affecting her right knee and hip, and requiring her to use crutches.  (*Id*. at 201-02.)  Later that month, she reported she was "able to bear weight somewhat better than at her" previous visit, that her right hip was "slightly doing better," but that she still continued "with pain with range of motion of the knee." (*Id*. at 367.)  At that time, Mrs. Correia-Pires was instructed to discontinue the use of crutches in favor of a cane.  (*Id*.)  Shortly thereafter, she was referred to Dr. David Bullis for purposes of treating osteoarthritis affecting her right knee.  (*Id*. at 236.)

In May 2007, Dr. M.A. Gopal assessed Mrs. Correia-Pires's physical residual functional capacity.  (*Id*. at 223-30.)  Upon examination, Dr. Gopal found that Mrs. Correia-Pires suffered from right knee arthritis, asthma and obesity.  (*Id*. at 223.)  With these conditions in mind, Dr. Gopal opined that Mrs. Correia-Pires could stand or walk for less than 2 hours, sit for about 6 hours in an 8-hour workday and found she had several environmental limitations.  (*Id*. at 224, 227.)  Mrs. Correia-Pires was told to avoid concentrated exposure to extreme heat or cold, humidity, fumes, odors, gases, poor ventilation and hazards.  (*Id*. at 227.)

Approximately two months later, in July 2007, Dr. Harry VonErtfelda, M.D., performed an independent medical evaluation

of Mrs. Correia-Pires for worker's compensation purposes. (*Id.* at 231-34.) Dr. VonErtfelda noted that Mrs. Correia-Pires had a right knee strain and arthritis, was "markedly overweight" and walked with a cane. (*Id.* at 233.) He nevertheless opined that she was "capable of working doing sedentary work only," so long as it did not include "long periods of walking or standing." (*Id.* at 234.) Consistent with this opinion, Dr. Bullis noted in July 2007 that "[s]he could go back to work at this time for sitting work type position." (*Id.* at 243.)

Dr. Bullis recommended in September 2007 that Mrs. Correia-Pires undergo "a right knee arthroscopy with chondroplasty surgery to try and smooth out her cartilage." (*Id.* at 244.) Another physician, Dr. Anthony Caprio, examined Mrs. Correia-Pires in April 2008, and confirmed Dr. Bullis's recommendation that she would benefit from a right knee arthroscopy. (*Id.* at 304.) He also observed that "she cannot go back to work with a cane, but she can do deskwork with a cane." (*Id.*) Mrs. Correia-Pires underwent the surgery in July 2008. (*Id.* at 391-92, 394-95.)

In April 2009, Dr. Dias-Hoff completed a Medical Source Statement regarding Mrs. Correia-Pires's ability to do work-related activities. (*Id.* at 419-20.) In her report, Dr. Dias-Hoff noted that Mrs. Correia-Pires was unable to sit for more than one hour, and to walk and stand for more than 15 minutes in

an 8-hour workday.  (*Id*. at 419.)  The total hours combined that
Mrs. Correia-Pires was able to sit, stand, and walk during an 8-
hour workday was limited to 3 hours, according to Dr. Dias-Hoff.
(*Id*.)  Finally, Dr. Dias-Hoff noted that Mrs. Correia-Pires was
subject to several environmental limitations, preventing her from
being exposed to extreme cold and heat, humidity, wetness, dust,
and fumes.  (*Id*. at 420.)

Later in April 2009, Mrs. Correia-Pires was treated for low
back pain and knee osteoarthritis by Dr. Parakrama Ananta and
referred to Denise Bryer for physical therapy.  (*Id*. at 473-74.)
In May 2009, Mrs. Bryer observed that Mrs. Correia-Pires's
sitting tolerance was limited to one hour and that her knee
restricted her ability to stand or walk.  (*Id*. at 493.)  She also
noted her difficulty in performing daily tasks, such as doing the
laundry, cleaning the bathtub or vacuuming.  (*Id*.)  During
another visit with Dr. Ananta in August 2009, Mrs. Correia-Pires
stated that she had "noticed some improvement with her
flexibility and range of motion, but continue[d] to complain of
persistent low back pain."  (*Id*. at 504.)

Upon Dr. Ananta's recommendation, Mrs. Correia-Pires
underwent a series of facet joint injections and reported in
September 2009 "a significant improvement in her pain" and "a
much improved range of motion of lumbar spine."  (*Id*. at 550.)

Given these improvements, Dr. Ananta recommended that she "progress with her activities as tolerated." (*Id*.)

> 2. <u>Mental Impairments</u>

Mrs. Correia-Pires has a limited history of mental health conditions. In April 2008, Dr. Dias-Hoff diagnosed Mrs. Correia-Pires with menstrual mood swings, irritability, flashes, but determined that her "depression" was "better/stable" in January 2009. (*Id*. at 429-44.) Starting in July through September 2009, Mrs. Correia-Pires sought mental health treatment for depression and anxiety. (*Id*. at 528-48.) Her therapist, Courtney Pilotte, opined in July 2009 that she had "maladaptive health behavior, stress related psychological effects" and assigned her a current Global Assessment of Functioning ("GAF") of 30.[1] (*Id*. at 534.)

---

[1] The Global Assessment of Functioning ("GAF") evaluates overall psychological functioning on a scale of 0-100 that takes into account "psychological, social, and occupational functioning." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), at 32 (4th ed. 2000). For instance, a GAF in the range of 21 to 30 reflects a behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment" or "inability to function in almost all areas"; of 31 to 40 indicates "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood;" of 41 to 50 reflects "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning"; of 51 to 60 indicates "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning"; of 61 to 70 reflects "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning," but "generally functioning pretty well, [with] some meaningful interpersonal relationships." *Id*. at 34.

During the month that followed, Mrs. Pilotte completed a Medical Source Statement regarding Mrs. Correia-Pires's ability to do work-related activities. (*Id*. at 546.) In that statement, Mrs. Pilotte noted that Mrs. Correia-Pires did not have any specific limitation to understand simple instructions or to make judgements on simple work-related decisions. (*Id*.) She noted, however, that Mrs. Correia-Pires's ability was extremely reduced when she had to carry out complex, or even simple, instructions and that she experienced "extreme" difficulty in maintaining concentration for an extended period of time. (*Id*.) Mrs. Pilotte concluded that Mrs. Correia's ability to interact with supervisors, co-workers, and the public was affected by these impairments. (*Id*.)

**B.   *Procedural History***

   1.   Plaintiff's Application for Benefits

Mrs. Correia-Pires applied for SSDI benefits on March 14, 2007.[2] (*Id*. at 105-112.) Three years earlier, she had filed an application for SSI benefits, which was later consolidated with her SSDI application. (*Id*. at 10.) Mrs. Correia-Pires claims disability since December 7, 2006 (i.e., the date of her work-

---

[2]   Although the ALJ's decision states that Mrs. Correia-Pires's application for Social Security Disability Insurance ("SSDI") benefits was made on March 12, 2007, the administrative record indicates that the correct date was March 14, 2007. (Adm. Rec. 105.)

related injury)[3] due to arthritis in her right knee and impairment in her right hip. (*Id.* at 142.) Both applications were denied at the initial level of review on May 14, 2007 and then by the Federal Reviewing Official on June 9, 2008. (*Id.* at 69-80.)

### 2. ALJ's Hearing

Pursuant to Mrs. Correia-Pires's request, an administrative hearing was held before Administrative Law Judge, Barry H. Best (the "ALJ") on October 22, 2009. (*Id.* at 27-66.) Mrs. Correia-Pires, who was forty-six years old at the time, testified about her ability to perform daily activities. (*Id.* at 35, 42-45.) She explained that she was able to vacuum, do the laundry and clean the bathtub, but expressed having great difficulties in performing these tasks. (*Id.* at 42.) Typically, she said, it would now take her "all day" to clean her house. (*Id.* at 42-43.) As to her functional limitations, Mrs. Correia-Pires testified that she was able to lift five to ten pounds, to stand and walk for ten to fifteen minutes or less depending on the weather, and to sit for approximately five to twenty minutes. (*Id.* at 44.)

---

[3] Because the administrative record does not contain any procedural papers concerning Mrs. Correia-Pires's application for Supplemental Security Income ("SSI") benefits, the Administrative Law Judge ("ALJ") referred to the date of the SSI application, i.e., March 9, 2004, as the onset date for purposes of these benefits. (*Id.* at 10.)

She also recognized needing her cane at all times. (*Id.* at 44-45.)

Dr. Steven Sacks, a vocational expert, testified at the hearing as well. (*Id.* at 61-65.) The ALJ questioned Dr. Sacks about the following hypothetical:

> Dr. Sacks, I'd like you to consider a hypothetical Claimant of the same age, education and work as done by this Claimant. Okay, residual capacity for work, for a range of work at the sedentary exertional level. The Claimant would be limited to walking and standing to even a greater degree then [*sic*] implied by the usual definition of sedentary work, so be able to walk and stand not more then [*sic*] an hour in an eight-hour workday, although she would require the opportunity to stand at will and might stand for just a few minutes per hour. She would not be able to, she would never be able to climb ladders, she would not be able to climb stairs more then occasionally and not more then [*sic*] a few steps and she would only very occasionally be able to balance, stoop, kneel, crouch or crawl. She would also be limited in terms of environmental conditions that she could work where air quality is comparable to that that would be found in the public office building. She could not work where levels of dust or smoke or scents or perfumes or airborne ordinary irritants are at higher levels that would be encountered in the public office space. She could not work where she would be exposed to temperature or humidity extremes and she'd be limited to unskilled work tasks.

(*Id.* at 63-64.) Dr. Sacks responded that a claimant with these impairments could not perform Mrs. Correia-Pires's past occupations,[4] which all required "semi-skilled" and "light"

---

[4] Mrs. Correia-Pires's past work experience includes working as an assistant manager, cashier and greeter, crew person at a fast food chain, aide at a doctor's office, hardware clerk in a retail store, and toddler teacher, all of which were beyond her residual functional capacity. (*Id.* at 62-63.)

tasks.  (*Id.* at 63-64.)  He stated, however, that there were
other "unskilled" and "sedentary" jobs in the national economy,
such as receptionist, office clerk, and production inspector,
that could be performed by a claimant with the stated
limitations.  (*Id.* at 64.)  Dr. Sacks estimated that there were
approximately 99,000 positions as a receptionist in the national
economy and 1,900 in Southeastern Massachusetts and Rhode Island;
64,000 positions as an office clerk nationally and 2,800 locally;
and 11,000 positions as a production inspector in the national
economy and 80 and in the regional economy.  (*Id.*)  The estimate
for the number of available positions for production inspector
was, Dr. Sacks declared, adjusted "to accommodate portions of the
hypothetical, primarily . . . the conditions comparable to an
office environment and sitting beyond the definition of
sedentary."  (*Id.*)

   3.   ALJ's Decision

     On November 18, 2009, the ALJ issued a decision concluding
that Mrs. Correia-Pires was not disabled within the meaning of
the Social Security Act.  (*Id.* at 10-20.)  In reaching this
result, the ALJ observed that Mrs. Correia-Pires suffered from
several severe impairments, such as lumbar degenerative disc
disease, degenerative joint disease of her right knee, asthma,
obesity, depression, and anxiety, and therefore was "unable to
perform any past relevant work."  (*Id.* at 13-19.)  The ALJ found,

however, that despite these impairments, Mrs. Correia-Pires had the residual functional capacity to perform a wide range of unskilled and sedentary work, "except that she requires the opportunity to stand for a few minutes each hour," "is limited to a total of only one hour of standing in an 8-hour workday," and "is further limited to only occasional climbing, balancing, stooping, kneeling, squatting, crouching, and crawling." (*Id.* at 15-18.) Based on the testimony of the vocational expert, the ALJ concluded that "considering [her] age, education, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Mrs. Correia-Pires] can perform." (*Id.* at 19-20.) The ALJ's decision was affirmed by the Decision Review Board on March 5, 2010. (*Id.* at 4-6.)

## II.  STATUTORY FRAMEWORK

### A.  *Standard for Entitlement to SSDI and SSI Benefits*

In order to be entitled to SSDI and SSI benefit, an individual must be "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(d)(1)(A) (defining the term "disability" in the context of SSDI), 1382c(a)(3)(A) (defining the term "disability" in the context of SSI).  The term "disability" refers to the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than [twelve] months." *Id.* To constitute sufficient grounds for disability, the impairment must so severe that considering his or her "age, education, and work experience," the claimant is unable to engage "in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making a determination on disability, an ALJ must apply the following five-step sequential evaluation process:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4), 416.320(a)(4)). "The applicant has the burden of production and proof at the first four steps of the process." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). "Once the applicant has met his or her burden at Step [four] to show that he or she is unable to do past work due to the significant limitation, the Commissioner then has the burden at Step [five] of coming forward with evidence of specific jobs in the national

economy that the applicant can still perform." *Seavey*, 276 F.3d at 5.

## B.   *Standard of Review of ALJ's Decision*

Judicial review of social security disability determinations is authorized by Section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).  Under § 205(g), the reviewing "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id*.  Judicial review is, however, "limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

The ALJ's findings of fact must be upheld when "supported by substantial evidence," 42 U.S.C. § 405(g), but not "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  "Substantial evidence, in turn, means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998).

### III. DISCUSSION

Mrs. Correia-Pires argues that the ALJ's decision suffers
from two failings: the ALJ (A) failed to weigh some of her
exertional and non-exertional limitations properly in assessing
her residual functional capacity, and (B) erred in relying on the
vocational evidence to conclude that she retained the ability to
perform other work.

### A.   *The ALJ's Assessment of the Residual Functional Capacity*[5]

Mrs. Correia-Pires contends that the ALJ's determination
that she had the residual functional capacity to perform
sedentary and unskilled work was erroneous because the ALJ failed
to properly (1) consider the opinion of her treating physician,
(2) assess the credibility of her subjective complaints, (3) and
include certain limitations resulting from (3) her mental and
environmental impairments, (4) her need for a cane, and (5) her
obesity.  For the reasons stated below, I find that the ALJ
appropriately weighed the evidence of record in determining Mrs.
Correia-Pires's residual functional capacity.

---

[5]  Residual functional capacity is an administrative
"assessment of an individual's ability to do sustained
work-related physical and mental activities in a work setting on
a regular and continuing basis," despite his or her limitations.
Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1
(S.S.A. July 2, 1996).  The residual functional capacity
represents "not the *least* an individual can do despite his or her
limitations or restrictions, but the *most*."  *Id.*

13

1.    Consideration of the Treating Source Opinion

     The ALJ afforded "little weight" to the opinion of Mrs.

Correia-Pires's treating physician, Dr. Dias-Hoff, finding that

her opinion was "inconsistent with the evidence of record as a

whole." (Adm. Rec. 18.)  Mrs. Correia-Pires faults the ALJ for

not giving controlling weight to Dr. Dias-Hoff's opinion, despite

her long treating relationship.

     Pursuant to 20 C.F.R. § 404.1527(d)(2), an ALJ may "give

more weight to opinions from [the] treating sources, since these

sources are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [the claimant's]

medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  An ALJ may

nevertheless afford very little probative value to the opinion of

a treating physician when such opinion is not "well-supported by

medically acceptable clinical and laboratory diagnostic

techniques" or is otherwise "inconsistent with the other

substantial evidence in [the] case record."[6]  *Id.*; *cf. Leahy v.

Raytheon*, 315 F.3d 11, 21 (1st Cir. 2002) ("[W]hen other evidence

_____

     [6]  An ALJ may weigh the following factors in assessing the
probative value of a treating physician's opinion: 1) the length
of the treatment relationship and the frequency of examination;
2) the nature and extent of the treatment relationship; 3) the
relevant evidence in support of the medical opinion; 4) the
consistency of the medical opinion reflected in the record as a
whole; 5) whether the medical provider is a specialist in the
area in which he or she renders the medical opinion; and 6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(d)(2).

sufficiently contradicts the view of a treating physician, that
view appropriately may be rejected.").

The ALJ's conclusion that Dr. Dias-Hoff was not entitled to
significant probative weight was supported by substantial
evidence. The ALJ rejected Dr. Dias-Hoff's opinion that "the
severity of [Mrs. Correia-Pires]'s low back pain, which she rates
as only 'moderate' would preclude her from all employment on an
ongoing sustained basis." (Adm. Rec. 18.) That view was in fact
contradicted by no less than four other physicians, some of whom
had been treating Mrs. Correia-Pires for an extended period of
time. For instance, Dr. Bullis noted in July 2007 that "[s]he
could go back to work at this time for sitting work type
position." (*Id*. at 243.) During that same month, Dr.
VonErtfelda confirmed Bullis' view that she was capable of "doing
sedentary work." (*Id*. at 234.) Mrs. Correia-Pires's ability to
perform certain work was later confirmed by Dr. Caprio, as well
as by Dr. Ananta. (*Id*. at 306, 550.)

For these reasons, I find the ALJ had no supportable basis
for concluding that Dr. Dias-Hoff's opinion was inconsistent with
other medical opinions contained in the record. I conclude the
ALJ's decision to afford little probative value to Dr. Dias-
Hoff's opinion was supported by substantial evidence.

## 2. Credibility of Plaintiff's Statements and Subjective Complaints

The ALJ found that Mrs. Correia-Pires's statements regarding

her ability to perform certain daily activities were "clearly inconsistent with allegations of inability to engage in even sedentary work activity." (*Id*. at 18.) Mrs. Correia-Pires disputes the ALJ's characterization of her daily activities.

To the extent that "the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). In making this determination, the ALJ must consider a series of factors,[7] including the claimant's daily activities, in addition to the objective medical evidence. *Id*. at *3. The ALJ's credibility determination "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence [he] considered in determining to disbelieve the [claimant]." *Rohrberg v. Apfel*, 26 F. Supp. 2d 303, 309 (D.

---

[7] Other factors applicable in evaluating the severity of a claimant's symptoms include the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication that the claimant takes to alleviate the pain or other symptoms; any treatment, other than medication, received by the claimant for relief of pain or other symptoms; any measures used by the claimant to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 96-7 p. 1996 WL 374186, at *3 (S.S.A. July 2, 1996).

Mass. 1998) (quoting *DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986) (second alteration in original)); *see also* SSR 96-7p, 1996 WL 374186, at *2 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.).

The ALJ adequately weighed the evidence of record in assessing the credibility of Mrs. Correia-Pires's complaints. During the ALJ's hearing, Mrs. Correia-Pires testified about her daily activities. In particular, she stated that she was able to vacuum, do the laundry, clean the bathtub, do some cooking, and go to the grocery store with her husband. (Adm. Rec. 42-43.) She also conceded being able to clean her house, though it would take her "all day." (*Id.*) Based on this testimony, the ALJ supportably found that "her extensive daily activities including her ability to perform some household chores such as vacuuming, doing laundry, and going food shopping are clearly inconsistent with allegations of inability to engage in even sedentary work activity." (*Id.* at 18.) The mere fact that Mrs. Correia-Pires experienced some non-negligible difficulties in accomplishing certain daily activities, sometimes requiring her to sit and rest, does not contradict her ability to perform *sedentary* work.

This is particularly true where, as here, no less than four physicians confirmed her ability to do so. Even Mrs. Correia-Pires herself admitted less than a month prior to the hearing that she felt "a significant improvement in her pain," as well as "a much improved range of motion." (*Id.* at 550.)

Accordingly, I conclude that the decision of the ALJ to give little weight to Mrs. Correia-Pires's subjective complaints was supported by substantial evidence.

3.  Consideration of Plaintiff's Mental and Environmental Limitations

Mrs. Correia-Pires contends that, although the ALJ found that she suffered from asthma, depression, and anxiety, the ALJ failed to include in his residual functional capacity assessment any mental and environmental restrictions reflecting these impairments.

Mrs. Correia-Pires correctly cites to SSR 96-8P for the proposition that the ALJ had to consider "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The evidence of record demonstrates, however, that the ALJ properly considered her mental and environmental limitations in assessing her residual functional capacity. As to her asthma, although the ALJ did not explicitly include any limitations in his residual functional capacity

assessment reflecting this impairment, he expressly referenced this limitation in his opinion.  (Adm. Rec. 13.)  Moreover, when the ALJ questioned the vocational expert on the hypothetical claimant, he expressly referred to her environmental limitations. (*Id.* at 63-64.)  Specifically, the ALJ stated that the hypothetical claimant would "be limited in terms of environmental conditions that she could work where air quality is comparable to that that would be found in the public office building," that she "could not work where levels of dust or smoke or scents or perfumes or airborne ordinary irritants are at higher that would be encountered in the public office space," and that she "could not work where she would be exposed to temperature or humidity extremes."  (*Id.*)

    In addition, the ALJ properly weighed the evidence of record reciting Mrs. Correia-Pires's mental limitations.  As noted by the ALJ, Mrs. Correia-Pires has sought out "very little, if any, psychiatric treatment," given that her mental health treatment only lasted from July to September 2009.  *Id.* at 17.  The ALJ observed that Mrs. Correia-Pires's therapist, Courtney Pilotte,[8] had diagnosed her with depression and assigned a GAF of 30, but supportably found that this disabling GAF score was inconsistent

---

    [8]  The administrative record suggests that Courtney Pilotte holds a CAGS ("Certificate of Advanced Graduate Studies").  (Adm. Rec. 548.)  However, as the ALJ noted, it is unclear whether Mrs. Pilotte constitutes an "acceptable medical source" under 20 C.F.R. § 404.153 or § 416.913.  (*Id.* at 17 n.4.)

with the evidence of record as a whole. (*Id.*) To be sure, Mrs. Correia-Pires was also diagnosed with "depression-related symptoms," i.e., mood swings, in April 2008, but Dr. Dias-Hoff noted that her depression was "better/stable" in January 2009. (*Id.* at 429-44.) Dr. Dias-Hoff's opinion is consistent with Mrs. Correia-Pires's testimony at the hearing, during which she did not complain of any specific signs of depression or anxiety, other than to say that she feels anxious "[e]very time th[e] phone rings." (*Id.* at 59.) Accordingly, the ALJ's finding that "[n]o other evidence in the record suggests anything like a level of psychological indicated by Ms. Pilotte, which would usually be a marker for a need for inpatient psychiatric treatment," is supported by substantial evidence.

### 4. Consideration of Plaintiff's Need for a Cane

Mrs. Correia-Pires complains that the ALJ failed to consider her need for a cane in assessing her residual functional capacity to sedentary work. In particular, she faults the ALJ for not including her need for a cane in his hypothetical to the vocational expert.

Pursuant to SSR 96-9P, "an individual who uses a medically required[9] hand-held assistive device in one hand may still have

_____

[9] Mrs. Correia-Pires's medical need for a case is undisputed. Dr. Dias-Hoff observed that she needed a cane to ambulate following her work-related accident in December 2006. (Adm. Rec. 293.) In addition, Mrs. Correia-Pires acknowledged during the ALJ's hearing needing her cane "all the time." (*Id.* at 44-45.)

the ability to perform . . . many sedentary unskilled occupations." 1996 WL 374185, at *7 (S.S.A. July 2, 1996). In these situations, the Social Security ruling states that "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." *Id.*

Mrs. Correia-Pires's allegation that the ALJ did not consider her need for a cane for purposes of assessing her residual functional capacity is unfounded. The ALJ expressly noted that limitation in his decision. (Adm. Rec. 14-15.) More importantly, although the ALJ did not expressly include the need for a cane in his hypothetical to the vocational expert, he did refer to the impact this functional limitation would have on Mrs. Correia-Pires's mobility. The ALJ questioned the vocational expert about a hypothetical claimant, who "would be limited to walking and standing to even a greater degree then [*sic*] implied by the usual definition of sedentary work, so be able to walk and stand not more then [*sic*] an hour in an eight-hour workday, although she would require the opportunity to stand at will and might stand for just a few minutes per hour." (*Id.* at 63.) Even Mrs. Correia-Pires testified that she is able to stand and walk with her cane for ten to fifteen minutes at a time. (*Id.* at 44-45.)

Given the functional limitations enunciated in the hypothetical, the vocational expert was able to assess Mrs.

Correia-Pires's residual functional capacity as limited to
sedentary work, even without express mention of her need for a
cane.  This finding is consistent with Dr. Caprio's opinion that
"she can do deskwork with a cane."  (*Id.* at 306.)

     5.   <u>Impact of Plaintiff's Obesity</u>

    Mrs. Correia-Pires contends that the ALJ failed to explain
the impact of her obesity in assessing her residual functional
capacity.  Instead, he summarily stated in his decision that "the
provisions of Social Security Rulings SSR 00-3P[10] and 02-1P have
been considered and applied."  (Adm. Rec. 17.)

    Pursuant to SSR 02-1P, the term "obesity" refers to  "a
complex, chronic disease characterized by excessive accumulation
of body fat" resulting from a combination of factors (e.g.,
genetic, environmental, and behavioral).  2000 WL 628049, at *2
(S.S.A. Sept. 12, 2002).  Obesity constitutes a "medically
determinable impairment" to be considered when assessing an
individual's residual functional capacity.  *Id*. at *1.  As a
result, the ALJ must assess "the effect obesity has upon the
individual's ability to perform routine movement and necessary
physical activity within the work environment."  *Id*. at *6.

    The ALJ gave appropriate weight to the impact of Mrs.
Correia-Pires's obesity in assessing her residual functional
capacity.  The ALJ found that Mrs. Correia-Pires had a history of

---

    [10]   Social Security Ruling ("SSR") 02-1P superseded SSR 00-
3P.  SSR 02-1P, 2000 WL 628049, at *1 (S.S.A. Sept. 12, 2002).

obesity, which he qualified as a severe impairment. (Adm. Rec. 13.) Although Mrs. Correia-Pires's obesity may limit her ability to perform certain types of activities, this condition does not necessarily affect her ability to conduct *sedentary* work. The ALJ's decision gave probative value to medical opinions that concluded that Mrs. Correia-Pires was able to perform sedentary work, despite her obesity. For instance, Dr. VonErtfelda opined that, despite her being "markedly overweight," Mrs. Correia-Pires was capable of doing sedentary work. (*Id.* at 233-34.) The same conclusion was later reached by Dr. Caprio. (*Id.* at 305-06.) Moreover, the ALJ included certain limitations which may result from obesity in his hypothetical question to the vocational expert. In particular, the ALJ stated that the hypothetical claimant "would never be able to climb ladders, she would not be able to climb stairs more than occasionally and not more then [*sic*] a few steps and she would only very occasionally be able to balance, stoop, kneel, crouch or crawl." (*Id.* at 63.) Consistent with the hypothetical, the ALJ concluded that, while Mrs. Correia-Pires retained the ability to perform sedentary work, "she is further limited to only occasional climbing, balancing, stooping, kneeling, squatting, crouching, and crawling." (*Id.* at 15.)

In sum, I conclude that the ALJ's determination that Mrs. Correia-Pires has the residual functional capacity to perform a

wide range of sedentary and unskilled work - albeit with certain limitations - is supported by substantial evidence.

## B.    *The ALJ's Determination of Disability*

The ALJ held at the final step of the sequential inquiry that "there are jobs that exist in significant numbers in the national economy that [Mrs. Correia-Pires] can perform." (*Id.* at 19-20.)  Mrs. Correia-Pires contends that, based on her residual functional capacity, the ALJ's conclusion that she retained the ability to adjust to other work is unsupported by substantial evidence.

In determining whether a successful adjustment to other work can be made, the ALJ must consider the residual functional capacity assessment, together with the claimant's "vocational factors" (i.e., age, education, and work experience).  20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).  In addition, the ALJ may use the Dictionary of Occupational Titles ("DOT") and vocational evidence to identify jobs in the national economy a claimant can perform.  The ALJ must observe the following ground rules in order to avoid any conflict between the DOT and the vocational evidence:

> Occupational evidence provided by a [vocational expert] or [vocational specialist] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational] evidence to support a determination or decision about whether the claimant is

24

disabled. . . .

> Neither the DOT nor the [vocational] evidence
> automatically "trumps" when there is a conflict. The
> adjudicator must resolve the conflict by determining if
> the explanation given by the [vocational expert] or
> [vocational specialist] is reasonable and provides a
> basis for relying on the [vocational expert] or
> [vocational specialist] testimony rather than on the DOT
> information.

SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).

Mrs. Correia-Pires argues that the ALJ erred in relying on the testimony of Dr. Sacks because some of the jobs he identified exceed the "unskilled and sedentary" level of her residual functional limitation. The Commissioner now concedes that Mrs. Correia-Pires does not have the ability to work as a receptionist or as an office clerk.[11]  The only remaining issue is therefore whether Mrs. Correia-Pires can perform the work of a "production inspector."  To defeat this proposition, she places great weight on the fact that the DOT does not list a specific classification for "production manager" and that the jobs that seem to match this classification all appear to require "light and skilled" work.  *See* DOT 806.261-042, 1991 WL 681422 (G.P.O. 1991) (defining outside production inspector as "light" and "skilled" work); DOT 806.261-046, 1991 WL 681423 (G.P.O. 1991) (defining

---

[11]  The job of "receptionist" is described in the DOT as involving "semi-skilled work."  *See* DOT 237.367-038, 1991 WL 672192 (G.P.O. 1991).  Likewise, the DOT describes the job "clerk" as one that involves "light" and "semi-skilled" work. *See* DOT 209.562-010, 1991 WL 671792 (G.P.O. 1991).

production plastic and composites inspector as "light" and "skilled" work).

The contention — that because the DOT failed to list "production inspector" as an occupational classification, the testimony of the vocational expert that the plaintiff could adjust to this position could not constitute substantial evidence — is unpersuasive in light of the holding in *Lindsley v. Commissioner of Social Security*, 560 F.3d 601 (6th Cir. 2009).[12] In *Lindsley*, the plaintiff had raised essentially the same argument as here. *Id*. at 605. The Sixth Circuit rejected this argument observing that "establishing that a conflict between the DOT and the [vocational expert]'s testimony exists simply because an occupation described by the [vocational expert] does not specifically appear in the DOT", *id*., was insufficient. As *Lindsley* made clear, "[t]he DOT contains information about most, *but not all*, occupations." *Id.* (quoting SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) (alteration in original)). That some occupations are listed with the term "inspector" or "production" does not change the outcome. *Id.* ("The fact, therefore, that a [vocational expert] and the DOT might use

_____

[12]   That the vocational expert in *Lindsley v. Commissioner of Social Security* testified that "production inspectors, at the unskilled level, would typically inspect in a standing posture," 560 F.3d 601, 604 (6th Cir. 2009), does not change the result in this case. As will be discussed below in greater detail, Dr. Sacks adjusted the numbers of production inspection jobs to reflect Mrs. Correia-Pires's sedentary limitation.

different terminology to describe employment positions does not establish that a conflict exists between these sources of evidence".").  For obvious reasons, the ALJ may prefer to rely in some complex cases on the vocational expert rather than on the DOT, given the expert's ability to tailor his opinion to the particular limitations of a claimant.  *See* SSR 00-4p, 2000 WL 1898704, at *3 (recognizing that "[t]he DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," whereas a vocational expert "may be able to provide more specific information about jobs or occupations than the DOT.").

Even assuming that a conflict existed, Mrs. Correia-Pires cannot demonstrate that the ALJ failed to satisfy his obligations under SSR 00-4p.  The ALJ inquired of the vocational expert whether his opinion was consistent with the DOT and was given an affirmative answer.  Her counsel was also afforded an opportunity to cross-examine Dr. Sacks.  The ALJ proceeded in a manner consistent with SSR 00-4p, *see Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 858 (6th Cir. 2010), given that SSR 00-4p does not impose a duty on the ALJ to interrogate the vocational expert any further, *see Lindsley*, 560 F.3d at 606.  The affirmative duty of the ALJ to elicit a reasonable explanation of a vocational expert in the presence of a conflict is limited to those instances when

the conflict is "apparent." SSR 00-4p, 2000 WL 1898704, at *2. Mrs. Correia-Pires has not demonstrated that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (per curiam) (quoting *Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008)). Nor could she. When the ALJ posed the hypothetical at the hearing, the vocational expert testified that Mrs. Correia-Pires could work as a production inspector, but that he needed to adjust the number of available positions for this job to accommodate portions of the hypothetical, primarily the condition of "sitting beyond the definition of sedentary." (Adm. Rec. p. 64.) "Because the vocational expert specifically limited his opinion to reflect sedentary work only . . . his testimony was a perfectly acceptable basis for the administrative law judge's conclusions." *Jones v. Astrue*, 619 F.3d 963, 978 (8th Cir. 2010) (quoting *Jones v. Chater*, 72 F.3d 81, 82 (8th Cir. 1995)).

Having found that the ALJ did not err in relying on the vocational evidence, I conclude that his determination that Mrs. Correia-Pires retained an ability to perform other work is supported by substantial evidence.[13]

---

[13] Although neither party has cited the case, I note the similarity of factual background and the divergence of outcome in a recent decision by Judge Saris. *Covel v. Astrue*, No. 09-10866, 2010 WL 3703267 (Sept. 16, 2010). In *Covel*, the vocational expert had testified, as here, that the claimant had the residual functional capacity to perform "sedentary and unskilled" work,

## IV. CONCLUSION

For the reasons set forth more fully above, I conclude that the Commissioner, through the ALJ, had "substantial evidence" to determine that Mrs. Correia-Pires was not disabled. Consequently, I GRANT Defendant's motion for an order affirming the decision of the Commissioner (Dkt. No. 16.) and DENY Mrs. Correia-Pires's motion for an order reversing that decision (Dkt. No. 14.).


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

including the job of "production inspector." *Id.* at *7. Judge Saris found that the vocational expert's testimony was inconsistent with the DOT, because "[j]obs that seem to match the title 'production inspector' are all listed as 'light and skilled.'" *Id.* at *7 n.1. *In Covel,* even the defendant had conceded that the expert's testimony was "beyond rehabilitation." *Id*. at *7. Although claimant's counsel had not raised this issue at the hearing, Judge Saris explained that the ALJ should have addressed the inconsistencies between the expert's testimony and the DOT, as required by SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000), and concluded that the ALJ's failure to do so warranted remand. *Id.*

The instant case differs, however, from *Covel* because the expert's testimony given by Dr. Sacks made clear that a proper assessment of Mrs. Correia-Pires's ability to perform the job of "production inspection" required an adjustment of the number of available positions for this job in the national economy. By doing so, Dr. Sacks therefore implicitly suggested, and the ALJ recognized, that a possible conflict may exist between Mrs. Correia-Pires's residual functional capacity as "unskilled and sedentary" and her ability to perform the job of "production inspection." As a consequence, I am satisfied that the ALJ appropriately considered in a nuanced fashion the relevant vocational evidence when he concluded that Mrs. Correia-Pires Plaintiff was not disabled.